Slip. Op. 12-149

## UNITED STATES COURT OF INTERNATIONAL TRADE

**Before: Nicholas Tsoucalas, Senior Judge**

| | | |
|---|---|---|
| FISCHER S.A. COMERCIO, INDUSTRIA AND AGRICULTURA AND CITROSUCO NORTH AMERICA, INC., | : : : | |
| | : | |
| Plaintiffs, | : : | |
| v. | : : | Court No.: 11-00321 |
| UNITED STATES, | : : | |
| | : | PUBLIC VERSION |
| Defendant, | : : | |
| and | : : | |
| FLORIDA CITRUS MUTUAL, and CITRUS WORLD, INC., | : : | |
| | : | |
| Defendant-Intervenors. | : : | |

### OPINION and ORDER

**Held:** Plaintiffs' Motion for Judgment on the Agency Record is denied because the final results of the Antidumping Duty Administrative Review issued by the Department of Commerce were supported by substantial evidence and were otherwise in accordance with the law.

Dated: December 6, 2012

Kalik Lewin, (Robert G. Kalik and Chelsea S. Severson) for Fischer S.A. Comercio, Industria and Agricultura and Citrosuco North America, Inc., Plaintiffs.

Stuart F. Delery, Acting Assistant Attorney General; Jeanne E. Davidson, Director, Patricia M. McCarthy, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (Joshua E. Kurland); Office of Chief Counsel for Import Administration, United States Department of Commerce, Mykhaylo Gryzklov, Of Counsel, for the United States, Defendant.

Barnes, Richardson & Colburn, (Matthew T. McGrath and Stephen W. Brophy) for Florida Citrus Mutual and Citrus World, Inc.,

Defendant-Intervenors.

**TSOUCALAS, Senior Judge:** This matter comes before the court upon the Motion for Judgment on the Agency Record filed by Fischer S.A. Comercio, Industria and Agricultura and Citrosuco North America, Inc. ("Fischer" and "Citrosuco," respectively, and "Plaintiffs" collectively). Plaintiffs contest certain determinations made by the United States Department of Commerce, International Trade Administration ("Commerce") in Certain Orange Juice from Brazil: Final Results of Antidumping Duty Administrative Review, Determination Not To Revoke Antidumping Duty Order in Part, and Final No Shipment Determination, 76 Fed. Reg. 50,176 (August 12, 2011) ("Final Results"). Commerce and defendant-intervenors, Florida Citrus Mutual and Citrus World, Inc., oppose this motion. For the reasons set forth below, the court finds that Commerce's determinations are supported by substantial evidence and are otherwise in accord with the law.

## BACKGROUND

On March 9, 2006, Commerce issued an antidumping order on certain orange juice from Brazil. See Antidumping Duty Order: Certain Orange Juice from Brazil, 71 Fed. Reg. 12,183 (Mar. 9, 2006). At Fischer's request, Commerce initiated an administrative review of the order for the period beginning March 1, 2009 and ending February 28, 2010. See Initiation of Antidumping and Countervailing Duty Administrative Reviews and Request for Revocation in Part, 75 Fed. Reg. 22,107 (Apr. 27, 2010).

During the preliminary review, Commerce requested certain information from Fischer in order to calculate the normal value ("NV")[1] and export price ("EP")[2] of the subject merchandise. Commerce requested that Fischer report information on "all sales of the foreign like product during the three months preceding the earliest month of U.S sales, all months from the earliest to the latest month of U.S. sales, and the two months after the latest month of U.S. sales." Memo from Analyst/IA to File (Apr. 28, 2010), Public Rec. 14 at § B.II.A.[3]  This request included information on sales occurring during the period of review ("POR") as well as sales from the so called "90/60-Day Window Period"

---

[1] "Normal Value" refers to "the price at which the foreign like product is first sold (or, in the absence of a sale, offered for sale) for consumption in the exporting country, in the usual commercial quantities and in the ordinary course of trade and, to the extent practicable, at the same level of trade as the export price or constructed export price." 19 U.S.C. § 1677b(a)(1)(B)(i) (2006).

[2] "Export Price" refers to the "price at which the subject merchandise is first sold (or agreed to be sold) before the date of importation by the producer or exporter of the subject merchandise outside of the United States to an unaffiliated purchaser in the United States or to an unaffiliated purchaser for exportation to the United States." 19 U.S.C. § 1677a(a).

[3] Hereinafter all documents in the public record will be designated "P.R." and all documents in the confidential record designated "C.R." without further specification except where relevant.  Additionally, the abbreviation "I.A." will refer to portions of the confidential and public records filed in Commerce's electronic filing system, I.A. Access.

("Window Period"), as defined in 19 C.F.R. § 351.414(f) (2012).[4]
P.R. 14 at § B.II.A.   The Window Period stretches up to three
months prior to and two months after a month without comparable
home market sales.  19 C.F.R. § 351.414(f)(2), (3).  Accordingly,
Fischer provided information on home market sales that occurred
during the POR as well as sales outside the POR during the Window
Period.  See P.R. 63 Ex. 4.

     Additionally, Commerce requested information on Fischer's
international  freight  expenses.    Fischer  reported  that  its
affiliate, Citrosuco, paid $[[     ]]/MT for shipments to the U.S.
during the POR, comprised of a base freight rate of $[[     ]]/MT
and a bunker fuel surcharge of $[[     ]]/MT.  See P.R. 71 Ex. 3.
Fischer also reported that its affiliate [[

        ]] operated most of the vessels that transported subject
merchandise to the U.S.  See P.R. 104 at 1.   Per Commerce's
request, Fischer provided a Sea Transport Service Agreement ("STS
Agreement") between Fischer's affiliated shipper and a third party,
[[                                        ]].  See P.R. 55 Ex.
9.  Fischer also provided an invoice from that agreement dated
within the POR indicating that [[   ]] charged [[        ]]
$[[     ]]/MT, comprised of a base freight rate of $[[     ]]/MT

---

     [4] At the time Plaintiffs submitted their brief, this provision
was located at 19 C.F.R. § 351.414(e)(2).  As part of the
amendments to the regulation effective April 16, 2012, the
regulation was moved but the provisions remain unaltered.

and a bunker fuel surcharge of $[[    ]]/MT.  <u>Id.</u> Ex. 8.

Commerce released the preliminary results of the administrative review on April 7, 2011.  <u>See Certain Orange Juice from Brazil: Preliminary Results of Antidumping Duty Administrative Review and Notice of Intent Not To Revoke Antidumping Duty Order in Part</u>, 76 Fed. Reg. 19,315 (Apr. 7, 2011) ("<u>Preliminary Results</u>"). Commerce determined that Fischer's shipping arrangement was "not at arm's length," and selected the $[[    ]]/MT rate from the STS Agreement as a surrogate rate from which to calculate Fischer's international freight expenses.  <u>Id.</u> at 19,318.  Commerce used the resulting value to reduce EP of the subject merchandise pursuant to 19 U.S.C § 1677a(c)(2)(A).  <u>See Preliminary Results</u>, 76 Fed. Reg. at 19,318.  Additionally, for months of the POR with no comparable home-market sales, Commerce calculated a constructed value ("CV") as a substitute for NV pursuant to 19 U.S.C. § 1677b(a)(4).  <u>Id.</u> at 19,317.  Commerce determined the profit component of the CV calculation using information from the Window Period sales that occurred outside the POR.  <u>Id.</u> 19,317; P.R. 103 at 17.  Commerce determined Fischer's weighted-average dumping margin ("WADM") to be 3.96%.  <u>Preliminary Results</u>, 76 Fed. Reg. at 19,321.

Following the <u>Preliminary Results</u>, Fischer submitted a case brief raising three issues: (1) the inclusion of the bunker fuel surcharge in the surrogate freight rate when calculating international freight expenses, (2) the use of zeroing to calculate

WADM, and (3) the use of sample sales to calculate profit ratio for not-from-concentrate orange juice. <u>See</u> P.R. 116 at iii.

On August 12, 2011 Commerce issued the final results of the review. <u>See</u> <u>Final Results</u>, 76 Fed. Reg. 50,176. Commerce lowered Fischer's WADM to 3.97%, <u>id.</u> at 50,178, but specifically rejected Fischer's arguments concerning zeroing and the bunker fuel surcharge. <u>See</u> <u>Issues and Decision Memorandum for the Antidumping</u> <u>Duty Administrative Review on Certain Orange Juice from Brazil</u>, Inv. No. A-351-840 (Aug. 5, 2011) at 4-8, 23-24 ("<u>I&D Memo</u>").

After Commerce released the <u>Final Results</u>, Fischer filed ministerial error comments with Commerce. <u>See</u> I.A.P.R. 17. Fischer contended that Commerce "committed a ministerial error when it neglected to include specific programming language in its [Analysis of Comparison Market Sales] to exclude home market sales occurring outside the [POR]." <u>Id.</u> at 3. Concluding that Fischer's comments did not actually concern a ministerial error, Commerce did not amend its calculation. <u>See</u> I.A.P.R. 19 at 2.

Plaintiffs raise three issues on appeal: (1) whether Commerce's decision to include the bunker fuel surcharge in the surrogate freight rate was proper, (2) whether Commerce's use of Window Period sales outside the POR to calculate CV profit ratio was proper, and (3) whether Commerce's use of zeroing to calculate WADM was proper. <u>See</u> Pls.' Br. at 1-2.

## JURISDICTION and STANDARD OF REVIEW

This Court has jurisdiction over this matter pursuant to 19 U.S.C. § 1516a(a)(2)(B)(iii) and 28 U.S.C. § 1581(c).

This Court will uphold Commerce's determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  Huaiyin Foreign Trade Corp. (30) v. United States, 322 F.3d 1369, 1374 (Fed. Cir. 2003) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938).

## DISCUSSION

### I. Bunker Fuel Surcharge

Commerce calculated Fischer's international freight expenses using a surrogate rate from the STS Agreement, see Preliminary Results, 76 Fed. Reg. at 19,318; I&D Memo at 24, which included a bunker fuel surcharge of $[[     ]]/MT.  P.R. 55 Ex. 8.  Pursuant to 19 U.S.C. § 1677a(c)(2)(A), Commerce calculated a constructed EP for the subject merchandise using Fischer's international freight expenses as a deduction.  See Preliminary Results, 76 Fed. Reg. at 19,318.  The bunker fuel surcharge increased the international freight expenses, lowering the constructed EP even further and, therefore, its inclusion made a finding of dumping more likely. See 19 U.S.C. § 1677(35)(A); Florida Citrus Mutual v. United States, 550 F.3d 1105, 1110 (Fed. Cir. 2008).  Plaintiffs argue

that Commerce overstated Fischer's international freight expenses,

and thus its dumping margin, by including the bunker fuel surcharge

in the surrogate rate.  See Pls.' Br. at 8.  Plaintiffs insist the

surrogate rate should be limited to $[[       ]]/MT, reflecting the

surrogate value for the base freight rate.  Id. at 11.  Plaintiffs

offer two arguments in support of this claim: either (1) Fischer

did not incur a bunker fuel surcharge during the POR, or, (2) if

Fischer did incur a bunker fuel surcharge, it would have been

reimbursed by its U.S. customers.  See id. at 8-14.

When calculating EP, Commerce is permitted to reduce the value

by "the amount, if any, included in such price, attributable to

any additional costs, charges, or expenses, and United States

import duties, which are incident to bringing the subject

merchandise" to the U.S.  19 U.S.C. § 1677a(c)(2)(A).  Commerce

adjusts EP to create a "'fair, 'apples-to-apples' comparison'

between U.S. price and foreign market value 'at a similar point in

the chain of commerce.'"  Florida Citrus, 550 F.3d at 1110 (quoting

Torrington Co. v. United States, 68 F.3d 1347, 1352 (Fed. Cir.

1995)).  The goal of the adjustments is to satisfy Commerce's

mandate to calculate EP as accurately as possible.  See Florida

Citrus 550 F.3d at 1111.

Plaintiffs argue that Commerce unlawfully overstated Fischer's

international freight expenses because Fischer did not incur a

bunker fuel surcharge during the POR.   Pls.' Br. at 9-12.

According to Plaintiffs, Fischer does not incur a bunker fuel surcharge unless bunker fuel rates exceed a certain price. Id. at 10. Plaintiffs indicate that under Fischer's sales contracts a "bunker fuel surcharge is passed along to its U.S. customer via a bunker fuel adjustment." Id. at 10. Fischer reported that its U.S. customers did not pay a bunker fuel adjustment during the POR. Id. at 11. Because Fischer never assessed a bunker fuel adjustment on its customers, Plaintiffs assert that Fischer never incurred a bunker fuel surcharge. Id. Furthermore, Plaintiffs insist that the bunker fuel surcharge from the STS Agreement should not have been included in Fischer's surrogate rate because "the conditions triggering the additional bunker fuel surcharge specific to [[

]] differ from those specific to Fischer's U.S. customers." Id. Accordingly, Plaintiffs conclude that the "inclusion of [[                    ]] bunker fuel surcharge . . . is arbitrary and contrary to record evidence." Id. at 12.

Plaintiffs' argument is misleading and contrary to record evidence. Plaintiffs essentially argue that Fischer never incurred a bunker fuel surcharge because it never reported passing that charge to its U.S. customers. However, bunker fuel surcharges differ from bunker fuel adjustments – a shipper levies a bunker fuel surcharge on its customer under their transport agreement, whereas the shipping customer levies a bunker fuel adjustment upon its own customers under a separate agreement. See Pls.' Br. at

10-11.   Accordingly, the bunker fuel surcharge in Fischer's shipping arrangements are distinct from the bunker fuel adjustments in Fischer's U.S. sales contracts.   The fact that Fischer did not report the receipt of a bunker fuel adjustment during the POR does not mean that Fischer or its affiliates did not pay a bunker fuel surcharge.   Just as Commerce concluded during the review, here Plaintiffs "conflate[] the bunker fuel surcharge at issue here with the bunker fuel adjustments."   I&D Memo at 24.   Thus, Plaintiffs fail to identify any evidence demonstrating that Fischer did not incur a bunker fuel surcharge.

Moreover, record evidence clearly indicates that Fischer did in fact incur a bunker fuel surcharge during the POR.   See P.R. 71 Ex. 3.   As noted above, Fischer submitted an invoice from the POR indicating that [[    ]] charged Citrosuco, Fischer's affiliate, $[[    ]]/MT for shipments to the U.S., including a bunker fuel surcharge of $[[    ]]/MT.   Id.   The invoice indicates that the total cost of shipping was $[[        ]], including a bunker fuel surcharge of $[[        ]] for shipments to the U.S.   Id.   The record also contains a partial payment, id., and an accompanying explanation indicating that Fischer still owed payment on the full outstanding balance.   See id. at 3.   Fischer neither challenged the $[[        ]] bunker fuel surcharge on the invoice nor indicated any intention to refuse payment.   See id.   Because record evidence indicates that Fischer incurred a bunker fuel

surcharge, Commerce's decision to include that charge in the surrogate rate was supported by substantial evidence.

Alternatively, Plaintiffs argue that "Commerce could deduct [the bunker fuel surcharge] only if Fischer's U.S. customers did not reimburse the expense." Pls.' Br. at 12. Plaintiffs contend that the bunker fuel surcharge should not be included in the international freight expenses because Fischer would have been reimbursed by its U.S. customers, resulting in a net expense of zero. Id. at 13. Accordingly, they insist that the international freight expenses should only include the base freight rate from the STS Agreement. Id. Essentially, Plaintiffs argue that Commerce should have offset the bunker fuel surcharge with the bunker fuel adjustment that would have been paid as a reimbursement. See id.

When adjusting EP under 19 U.S.C. § 1677a(c)(2)(A), Commerce is permitted to offset expenses incurred with refunds or reimbursements for those expenses. Florida Citrus, 550 F.3d at 1111. The rationale for granting offsets is the same rationale for making any other adjustment to EP under the statute: "because the resulting amount accurately represents the importer's overall duty liability." Id.

Plaintiffs ask the court to apply the holding in Florida Citrus and remand the instant case so that Commerce may recalculate Fischer's international freight expenses with an offset for an unreported bunker fuel adjustment. Pls.' Br. at 13. However,

Plaintiffs' reliance on <u>Florida Citrus</u> is flawed.  In <u>Florida Citrus</u>, the plaintiffs, a domestic industry, challenged Commerce's decision to offset import duties with drawback duties[5] when adjusting EP under 19 U.S.C. § 1677a(c)(2)(A).  <u>Florida Citrus</u>, 550 F.3d at 1108.  The Court of Appeals for the Federal Circuit ("Federal Circuit") held that 19 U.S.C. § 1677a(c)(2)(A) is ambiguous as to whether "import duties" meant "gross import duties" or "net import duties."  <u>Id.</u> at 1110.  In light of this ambiguity, the Federal Circuit found that granting offsets for reimbursements "enable[d] a fair 'apples-to-apples' comparison" between EP and NV, resulting in a more accurate measurement of dumping margin.  <u>Id.</u> at 1111. Accordingly, the Federal Circuit upheld Commerce's decision, concluding that the drawback duty refunds were "contingent upon and related to importing merchandise because they cannot be claimed without first importing the merchandise and paying the duties to Customs."  <u>Id.</u>

Conversely, in the instant case, the interests of accuracy and fairness would not be served by offsetting the bunker fuel surcharges with the hypothetical reimbursement Plaintiffs claim. Here, the record indicates Fischer incurred a bunker fuel surcharge

---

[5] The drawback program "permits importers to claim reimbursement of 99 percent of U.S. duties paid on imports when 'commercially interchangeable' merchandise is either (1) exported from the United States, or (2) destroyed within three years of the date of importation." <u>Florida Citrus</u>, 550 F.3d at 1109 (citing 19 C.F.R § 191.32(a)).

during the POR.  See P.R. 71 Ex. 3.  But, as Plaintiffs admit in

their brief, Fischer did not receive a bunker fuel adjustment

during the POR.  Pls.' Br. at 12.  Put simply, Plaintiffs are

asking for a reduction in expenses for a reimbursement that did not

occur.  Granting an offset in the instant case would be contrary to

the holding in Florida Citrus, as it would neither "enable a fair

'apples-to-apples' comparison" nor result in a more accurate

dumping margin.  Cf. Florida Citrus, 550 F.3d at 1111.  Commerce's

decision not to offset the bunker fuel surcharge with an unrealized

reimbursement was reasonable.  Thus, Commerce's decision to adjust

the EP based upon the full rate from the STS Agreement, including

the bunker fuel surcharge, was supported by substantial evidence

and otherwise in accord with the law.

## II. Window Period Sales

Commerce calculated Fischer's CV profit ratio using

information from all of Fischer's reported home-market sales,

including the Window Period sales that occurred outside the POR.

See Preliminary Results, 76 Fed. Reg. at 19,317.  Plaintiffs allege

that Commerce's use of sales outside the POR to calculate CV profit

ratio violated 19 C.F.R. § 351.414(f) and Commerce's own internal

guidelines.[6]  Pls.' Br. at 14.  However, Fischer failed to raise

---

[6] Commerce's Antidumping Manual states:

Where no sales of the like product are made in the
exporting country in the month of the U.S. sale,
[Commerce] will attempt to find a weighted-average

this issue before Commerce in the proper manner, and thus Plaintiffs are precluded from raising it before the court. <u>See</u> 28 U.S.C. § 2637(d).

As a general rule, this Court "shall, where appropriate, require the exhaustion of administrative remedies." <u>Id.</u> The Court of International Trade ("CIT") "has 'generally take[n] a strict view of the need [for parties] to exhaust [their] remedies by raising all arguments' in a timely fashion so that they may be appropriately addressed by the agency." <u>Corus Staal BV v. United States</u>, 30 CIT 1040, 1048 (2006) (not published in the Federal Supplement), <u>aff'd</u> 502 F.3d 1370 (Fed. Cir. 2007), (quoting <u>Pohang Iron & Steel Co. v. United States</u>, 23 CIT 778, 792 (1999) (not reported in the Federal Supplement)) (alterations in <u>Corus Staal</u>). "In the antidumping context, Congress has prescribed a clear, step-by-step process for a claimant to follow, and the failure to do so precludes it from obtaining review of that issue in the [CIT]." <u>JCM, Ltd. v. United States</u>, 210 F.3d 1357, 1359 (Fed. Cir. 2000) (citing <u>Sandvik Steel Co. v. United States</u>, 164 F.3d 596, 599-600 (Fed. Cir. 1998)).

The exhaustion requirement is subject to limited exceptions,

_____

monthly price one month prior, then two months prior, and then three months prior to the month of the U.S. sale. If unsuccessful, we will then look one month after and finally two months after the month of the U.S. sale. Import Administration, <u>Antidumping Manual</u>, ch. 6, p. 7 (Oct. 13, 2009).

which include:

> (1) [P]laintiff raised a new argument that was purely
> legal and required no further agency involvement; (2)
> plaintiff did not have timely access to the confidential
> record; (3) a judicial interpretation intervened since
> the remand proceeding, changing the agency result; (4) it
> would have been futile for plaintiff to have raised its
> argument at the administrative level.

Corus Staal BV v. United States, 30 CIT at 1050 n.11 (citing Budd

Co., Wheel & Brake Div. v. United States, 15 CIT 446, 452 n.2, 773

F.Supp. 1549, 1555 n.2 (1991)).   Additionally, where a party

properly challenges a ministerial error following the final results

of an administrative review, that party will be deemed to have

exhausted its administrative remedies with regards to that error.

See 19 U.S.C. § 1673d(e) ("The administering authority shall

establish procedures for the correction of ministerial errors in

final   determinations   within   a   reasonable   time   after   the

determinations are issued under this section.").

It is undisputed that Fischer did not challenge Commerce's use

of Window Period sales outside the POR in its case brief before

Commerce. See Pls.' Reply Supp. Mot. J. Agency R. at 4 ("Pls.'

Reply") ("Fischer presented this to Commerce . . . in its

ministerial error comments."); Def.'s Br. at 15. Further, none of

the recognized exceptions to the exhaustion requirement apply. The

timeliness of Plaintiffs' access to confidential records is not at

issue. Commerce's determination was not altered by an intervening

judicial opinion. The exception for purely legal questions does

not apply because Plaintiffs do not challenge the legality of 19

C.F.R. § 351.414(f) or Commerce's internal guidelines in and of themselves. See Fuwei Films (Shandong) Co. v. United States, 35 CIT __, __, 791 F. Supp. 2d 1381, 1384 (2011) (The purely legal issue exception "only might apply for a clear statutory mandate that does not implicate Commerce's interpretation of [a] statute"). Finally, the futility exception does not apply because there is no indication that Fischer would have been "'required to go through obviously useless motions in order to preserve [its] rights.'" See Corus Staal BV v. United States, 502 F.3d at 1379 (quoting Bendure v. United States, 554 F.2d 427, 431 (Ct. Cl. 1977)). Fischer should have raised this issue in its case brief, even if Commerce was unlikely to accept it. See id. ("The mere fact that an adverse decision may have been likely does not excuse a party from a statutory or regulatory requirement that it exhaust administrative remedies.").

    Instead, Plaintiffs argue that Fischer properly raised the Window Period sales issue as a ministerial error. See Pls.' Reply at 6-9. As noted above, Commerce rejected Fischer's ministerial error comments because they did not describe a ministerial error. I.A.P.R. 19 at 2. Plaintiffs make the same claim here, alleging that the inclusion of the Window Period sales, insofar as it violates 19 C.F.R. § 351.414(f) and Commerce's internal guidelines, must be a ministerial error. See Pls.' Reply at 8. Plaintiffs' argument must fail for two reasons: First, Commerce's decision to

reject Fischer's ministerial error comments was reasonable, and second, allowing Plaintiffs to use the ministerial error procedure in order to avoid claim preclusion on a substantive issue would allow the ministerial error exception swallow the administrative exhaustion requirement.

By definition, "ministerial errors" are "errors in addition, subtraction, or other arithmetic function, clerical errors resulting from inaccurate copying, duplication, or the like, and any other type of unintentional error the administering authority considers ministerial." 19 U.S.C. § 1673d(e). "Ministerial errors 'are by their nature not errors in judgment but merely inadvertencies.'" SGL Carbon LLC v. United States, 36 CIT __, __, 819 F. Supp. 2d 1352, 1363 (2012) (quoting NTN Bearing Corp. v. United States, 74 F.3d 1204, 1208 (Fed. Cir. 1995). This Court affords substantial deference to Commerce's determinations regarding ministerial error. See Shangdong Huarong Gen. Corp. v. United States, 25 CIT 834, 848, 159 F. Supp. 2d 714, 727-28 (2001) aff'd 60 Fed. App'x 797 (Fed. Cir. 2003) ("Statute, regulations, and case law largely leave the question of what constitutes a 'ministerial error' to Commerce's discretion.").

Commerce properly determined that Fischer's Window Period sales claim did not concern ministerial error. In its ministerial error comments, Fischer argued that Commerce "committed a ministerial error when it neglected to include specific programming

language . . . to exclude home market sales occurring <u>outside</u> the [POR]." I.A.P.R. 17 at 3. Commerce concluded that "Fischer's allegation involve[d] a methodical issue," I.A.P.R. 19 at 2, and refused to alter the final results. <u>Id.</u> Indeed, Commerce's use of Window Period sales was not an inadvertent computer programming error, but rather a method for calculating CV profit ratio. <u>See</u> <u>id.</u>; <u>Certain Steel Wire Rod from France</u>, 63 Fed. Reg. 30,185, 30,187 (June 3, 1998) (using a respondent's Window Period sales to calculate CV profit ratio). Fischer mischaracterized the issue before Commerce — and again in its reply brief — as an inadvertent mistake so that it would fit within the definition of ministerial error. By questioning Commerce's intentional decision to measure CV profit ratio using sales outside the POR, Fischer actually challenged Commerce's interpretation of 19 C.F.R. § 351.414(f) and its own guidelines. <u>See</u> <u>SGL Carbon</u>, 36 CIT at __, 819 F. Supp. 2d at 1363. Because Fischer's argument did not concern clerical error, miscalculation, or other ministerial error, Commerce's decision to reject it was proper. <u>See</u> 19 U.S.C. § 1673d(e).

Furthermore, the court will not allow Plaintiffs to make an end run around the exhaustion requirement by entertaining an unexhausted substantive issue disguised as a ministerial error. Because ministerial errors concern clerical and mathematical mistakes, the ministerial error procedure is not the appropriate method for a party to raise a new, substantive legal argument. <u>See</u>

19 U.S.C. § 1673d(e); Ta Chen Stainless Steel Pipe, Ltd. v. United States, 28 CIT 627, 644, 342 F. Supp. 2d 1191, 1205 (2004) ("The prescribed remedy for challenging Preliminary Results issued by [Commerce] is to file a case brief with the agency setting forth objections."). Plaintiffs may have phrased their argument in terms of inadvertent error, but they actually offer a substantive interpretation of 19 C.F.R § 351.414(f) and Commerce's Antidumping Manual to support that argument. See Pls.' Br. at 14-17. Allowing Plaintiffs to make this argument before the court betrays the purpose of the ministerial error procedure and undercuts the exhaustion requirement. This would enable a party to preserve a substantive legal challenge to Commerce's determination using the protection of the ministerial error process, thus depriving Commerce of its opportunity to defend its decision at the proper time. See United States v. L.A. Tucker Truck Lines, Inc., 344 U.S. 33, 37 (1952) ("[O]rderly procedure and good administration require that objections to the proceedings of an administrative agency be made while it has opportunity for correction in order to raise issues reviewable by the courts."). Plaintiffs can challenge Commerce's ministerial error decision, but they cannot abuse that opportunity by introducing a new substantive legal claim before the court. See 19 U.S.C. § 1673d(e); Ta Chen, 28 CIT at 644, 342 F. Supp. 2d at 1205. Accordingly, Plaintiffs are precluded from arguing their Window Period sales claim.

### III. Zeroing

Plaintiffs allege that Commerce's use of zeroing was wrongful because Commerce failed to provide an adequate explanation to justify its practice of zeroing to calculate WADM during reviews but not investigations. Pls.' Br. at 20.  In response, Commerce argues that inherent differences between investigations and reviews, as explained in the I&D Memo, provide sufficient justification for its practice of zeroing during reviews while offsetting during investigations. Def.'s Br. at 20-31.[7]

### A. Background

"Zeroing" refers to a method of calculating WADM by aggregating only the positive dumping margins from dumped transactions and assigning all non-dumped transactions a dumping margin of zero. See Timken Co. v. United States, 354 F.3d 1334, 1338 (Fed. Cir. 2004).  Alternatively, Commerce also calculates WADM by offsetting positive dumping margins from dumped transactions with negative dumping margins from non-dumped

---

[7] In its brief, Commerce also raises two additional arguments which were already rejected by the Federal Circuit: (1) the Federal Circuit previously upheld zeroing as a reasonable interpretation of 19 U.S.C. § 1677(35); and (2) it only changed its zeroing policy in order to comply with an adverse WTO ruling.  In Dongbu Steel Co. v. United States, the Federal Circuit held that Commerce's inconsistent interpretation of the statute was a novel issue so it was not bound by earlier decisions upholding zeroing as a reasonable interpretation of 19 U.S.C. § 1677(35).  See 635 F.3d 1363, 1371 (Fed. Cir. 2011).  The Federal Circuit also held that the adverse WTO determination, on its own, was insufficient to justify an inconsistent interpretation of 19 U.S.C. § 1677(35). See id. at 1372.

transactions at the aggregation stage.

At one point, Commerce calculated WADM using zeroing during both investigations, where it compares the average NV with the average EP of subject merchandise ("average-to-average comparisons"), as well as administrative reviews, where it compares the average NV with the EP of individual transactions ("average-to-transaction comparisons"). See Corus Staal BV v. Department of Commerce, 395 F.3d 1343, 1347 (Fed. Cir. 2005) (holding that zeroing is permissible during investigations); Timken Co., 354 F.3d at 1342 (holding that 19 U.S.C. § 1675(35) neither requires nor prohibits zeroing during administrative reviews). Recently, however, Commerce decided to abandon its practice of zeroing during investigations involving average-to-average comparisons following a determination by the World Trade Organization ("WTO") that this practice violated the U.S.'s international obligations. See Antidumping Proceedings: Calculation of the Weighted-Average Dumping Margin During an Antidumping Investigation; Final Modification, 71 Fed. Reg. 77,722 (Dec. 27, 2006). Commerce continues to use zeroing to calculate WADM during administrative reviews, Def.'s Br. at 29, resulting in an inconsistent application of 19 U.S.C § 1677(35)(A) as between administrative reviews and investigations.[8]

---

[8] Although WADM is codified in 19 U.S.C § 1677(35)(B), the definition of an individual "dumping margin" in 19 U.S.C § 1677(35)(A) will control what dumping margins are being aggregated

Following this policy shift, the Federal Circuit held that Commerce's inconsistent interpretation of 19 U.S.C § 1677(35) was arbitrary and required Commerce to either explain why its approach was reasonable or adopt a consistent approach. See JTEKT Corp. v. United States, 642 F.3d 1378, 1384-85 (Fed. Cir. 2011); Dongbu, 635 F.3d at 1373. In JTEKT Corp., Commerce explained that it zeroes during reviews because they involve average-to-transaction comparisons, whereas during investigations it offsets because it is making average-to-average comparisons. See JTEKT Corp., 642 F.3d at 1384. The Federal Circuit rejected Commerce's explanation, holding that "[i]t is not illuminating to the continued practice of zeroing to know that one phase uses average-to-average comparisons while the other uses average-to-transaction comparisons." Id.

Following Dongbu and JTEKT, this Court upheld Commerce's inconsistent interpretation of 19 U.S.C. § 1677(35) in Union Steel v. United States, 36 CIT __, 823 F. Supp. 2d 1346 (2012) (appeal pending).[9] Accepting Commerce's argument that there were inherent

------

in the WADM calculation under 19 U.S.C § 1677(35)(B).

[9] This Court also upheld Commerce's explanation for zeroing in Grobest & I-Mei Indus. (Vietnam) Co., Ltd. v. United States, 36 CIT __, 853 F. Supp. 2d 1352 (2012), which was decided after the defendant and defendant-intervenors' filed their briefs. Specifically, this Court found that during investigations offsetting is reasonable because "Commerce adopts a methodology intended to capture overall pricing behavior for the purpose of determining who should and should not fall within the purview of an antidumping order," id. at __, 853 F. Supp. 2d at 1361 while during reviews, Commerce zeroes because "a methodology that establishes the antidumping duty with greater accuracy is warranted both

differences in the way dumping margin is calculated as between reviews and investigations, respectively, this Court concluded that such differences were "sufficient to permit different approaches." Id. at __, 823 F. Supp. 2d at 1358. The issue before the court is whether Commerce adequately explained why differences between reviews and investigations justify calculating WADM differently in each stage — as it did in Union Steel — so as to satisfy the standard set out in Dongbu and JTEKT.

### B. Analysis

Commerce argues that the use of zeroing to calculate dumping margin during reviews but not investigations is reasonable because inherent differences between the two processes permit it to treat non-dumped transactions differently. See I&D Memo at 4-8. During administrative reviews, Commerce interprets 19 U.S.C. § 1677(35)(A) in the following manner: "[A] dumping margin exists only where NV is greater than export price. . . . Because no dumping margins exist with respect to sales where NV is equal to or less than EP or [Constructed EP], [Commerce] will not permit these non-dumped sales to offset the amount of dumping found with respect to other sales." I&D Memo at 4-5. Commerce disregards non-dumped transactions at the aggregation stage so that it can detect and counteract the effects of masked dumping – selling at high prices to disguise other sales

---

because the importer must actually pay the resulting antidumping duty and because it serves to uncover masked dumping." Id. at __, 853 F. Supp. 2d at 1361.

at less than fair value — which would otherwise be obscured by high priced sales. Id. at 5. Non-dumped sales still impact WADM as the aggregated dumping margin is divided by the total value of U.S. sales, which includes both dumped and non-dumped sales. Id.

During investigations, on the other hand, Commerce includes the non-dumped sales because it calculates dumping margin "at an 'on average' level" for all U.S. sales. I&D Memo at 6. Commerce explains that it "averages together high and low prices for directly comparable merchandise prior to making the comparison." Id. Commerce calculates a dumping margin for each group by comparing NV with an EP reflecting the average price of all sales in that group, including non-dumped transactions. Id. Each group's dumping margin inherently includes non-dumped sales, id., and therefore Commerce offsets positive margins with negative margins to determine the average extent of dumping activity. Id. Because dumping margin is calculated differently during an investigation than during a review, Commerce contends that its approach to 19 U.S.C. § 1677(35) is justified. Id. at 5.

Plaintiffs contend that Commerce's explanation was already rejected by the Federal Circuit in JTEKT Corp. and thus fails to justify the continued practice of zeroing during reviews but not investigations. Pls.' Br. at 20. When assessing Commerce's interpretation of 19 U.S.C. § 1677(35), this court undertakes the two-prong analysis from Chevron U.S.A. v. NRDC, 467 U.S. 837,

842-43 (1984).  The first issue is "whether Congress has directly spoken to the precise question at issue."  _Id._ at 842.  If Congressional intent is clear, "the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."  _Id._ at 842-43.  However, "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute."  _Id._ at 843.  For the following reasons, this court accepts Commerce's explanation of its zeroing practice.

Congress has not spoken directly on the issue of zeroing.  _See_ _Dongbu_, 635 F.3d at 1366; _Timken Co._, 354 F.3d at 1342.  Therefore, the issue is whether Commerce's inconsistent interpretation of 19 U.S.C. § 1677(35) is reasonable.  _See_ _Nat'l Org. of Veterans' Advocates, Inc. v. Sec'y of Veterans' Affairs_, 260 F.3d 1365, 1379-80 (Fed. Cir. 2001) (where an agency offers inconsistent interpretations of the same term, it "must explain the rationale for the different interpretations").  While a term should not be given contradictory meanings throughout the statute, "terms may be interpreted differently in different contexts."  _Union Steel_, 823 F. Supp. 2d at 1358 (citing _FAG Kugelfischer Georg Schafer Ag v. United States_, 332 F.3d 1370, 1373 (Fed. Cir. 2003)).

Here, Commerce provides a sufficient explanation justifying its policy of zeroing during reviews but not investigations.  In

JTEKT Corp., Commerce merely pointed out that reviews involve average-to-transaction comparisons while investigations use average-to-average comparisons, see JTEKT Corp., 642 F.3d at 1384, but, in the I&D Memo, Commerce demonstrated how these differences impact the WADM calculation. See I&D Memo at 4-6. During reviews, where Commerce is considering the sales of a respondent subject to an antidumping order, Commerce looks at the dumping activity at the transactional level in order to uncover masked dumping. Id. at 5. It is reasonable for Commerce to disregard non-dumped transactions – that is, to zero – at this stage because it enables Commerce to determine the actual extent of dumping activity, without the obscuring effect of non-dumped transactions. This interpretation of 19 U.S.C. 1677(35)(A) is consistent with the goal of the antidumping statute, which seeks to remedy dumping and the resulting injury to domestic industries. See Chaparral Steel Co. v. United States, 901 F.2d 1097, 1103 (Fed. Cir. 1990) (citing Imbert Imports, Inc. v. United States, 331 F. Supp. 1400, 1406 (Cust. Ct. 1971), aff'd 475 F.2d 1189 (C.C.P.A. 1973). This Court accepted a similar justification for zeroing in Union Steel, concluding that "when it comes to reviews, which are intended to more accurately reflect commercial reality, Commerce is permitted to unmask dumping behavior is a way that is not necessary at the investigation stage." Union Steel, 36 CIT at ___, 823 F. Supp. 2d at 1359. Zeroing during reviews is also justified because "it is

not unreasonable for Commerce to counteract as much dumping behavior as possible." Id., 823 F. Supp. 2d at 1359.

In the context of an investigation, Commerce looks to determine an average level of dumping activity rather than isolate dumping activity. I&D Memo at 6. Zeroing is not necessary because, unlike the individual dumping margins Commerce aggregates during reviews, the margins Commerce aggregates during investigations already include non-dumped transactions. Id. Offsetting is reasonable because the resulting WADM reflects the overall average level of dumping Commerce is looking for at this stage. This Court accepted this rationale for offsetting in Union Steel, recognizing that "[s]pecificity is less important in investigations" because Commerce was comparing "broad averages." Union Steel, 36 CIT at __, 823 F. Supp. 2d at 1359.

Given similarities between Commerce's explanations in Union Steel and in the instant case, the court finds that Commerce adequately explained its inconsistent interpretation of 19 U.S.C. § 1677(35)(A). Because it demonstrated that inherent differences between reviews and investigations justify interpreting 19 U.S.C. § 1677(35)(A) differently in each context, Commerce provided a reasonable explanation for the continued practice of calculating WADM using zeroing during reviews while offsetting during investigations. See Nat'l Org. of Veterans' Advocates, 260 F.3d at 1379-80.

Court No. 11-00321                                      **Page 28**

### CONCLUSION

For the foregoing reasons, the court concludes that the <u>Final Results</u> are supported by substantial evidence and are otherwise in accord with the law.

### ORDER

In accordance with the above, it is hereby

**ORDERED** that the determination of Commerce is **SUSTAINED**; and it is further

**ORDERED** that this action is dismissed


                                   /s/ NICHOLAS TSOUCALAS
                                  Nicholas Tsoucalas
                                  Senior Judge

Dated:  December 6, 2012
        New York, New York

Slip. Op. 12-149

## UNITED STATES COURT OF INTERNATIONAL TRADE

Before: Nicholas Tsoucalas, Senior Judge

| | |
|---|---|
| FISCHER S.A. COMERCIO, INDUSTRIA AND AGRICULTURA AND CITROSUCO NORTH AMERICA, INC.,      Plaintiffs,      v. UNITED STATES,      Defendant,      and FLORIDA CITRUS MUTUAL, and CITRUS WORLD, INC.,      Defendant-Intervenors. | Court No.: 11-00321 |

**JUDGMENT**

In accordance with the above, it is hereby

**ORDERED** that the determination of Commerce is **SUSTAINED**; and it is further

**ORDERED** that this action is dismissed.

/s/ NICHOLAS TSOUCALAS
Nicholas Tsoucalas
Senior Judge

Dated:   December 6, 2012
New York, New York